UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-21575-CIV-ALTONAGA/Simonton

**MOHANI JAGESSAR**,

    Plaintiff,
vs.

**WALGREEN CO.**,

    Defendant.
_____/

## ORDER

**THIS CAUSE** came before the Court on Defendant, Walgreen Co.'s ("Walgreens['s]") Motion for Summary Judgment . . . ("Motion") [ECF No. 41], filed with a Statement of Undisputed Material Facts ("Defendant's SMF") [ECF No. 40] on January 21, 2014. Plaintiff, Mohani Jagessar ("Jagessar") filed a Response to Defendant's Motion for Summary Judgment . . . ("Response") [ECF No. 45] together with a Statement of Facts in Opposition . . . ("Plaintiff's SMF") [ECF No. 45-1] on February 14, 2014. Walgreens filed its Reply . . . ("Reply") [ECF No. 46] on February 24, 2014. The Court has carefully considered the parties' written submissions, the record, and applicable law.

### I. BACKGROUND[1]

**A. Introduction**

This case involves an employee's discrimination claim against her former employer following the employee's termination. Walgreens is a corporation engaged in retail sales and pharmacy services. (*See* Amended Complaint . . . ("Amended Complaint") ¶ 6 [ECF No. 17]).

---

[1] Pursuant to Local Rule 56.1, undisputed facts set forth by the movant and supported by evidence in the record are deemed admitted.

Jagessar, who was born in Guyana, South America, was hired by Walgreens in 2004. (*See* Def.'s SMF ¶¶ 1, 4). In 2007, Jagessar successfully applied for a management position and was hired as an Assistant Manager. (*See id.* ¶ 4). In 2008, Jagessar was promoted to Executive Assistant Manager ("EXA"), a "stepping-stone position" to becoming Store Manager. (*Id.* ¶ 8). EXAs are the second-highest management position in the store. (*See id.* ¶ 13). Jagessar was an EXA at the time of her termination in September 2012. (*See* Deposition of Mohani Jagessar ("Jagessar Deposition") 134:20–138:19 [ECF No. 41-1] (discussing Jagessar's EXA salary and end-of-year bonus for 2012, the year she was terminated)).

Throughout her time with Walgreens, Jagessar reported to District Manager Anthony Gurreri ("Gurreri"), who is "American (and not Hispanic or Guyanese)," and who was responsible for hiring and promoting Jagessar. (Def.'s SMF ¶¶ 6, 8; Jagessar Dep. 23:14–24). Gurreri also supervises Jagessar's husband, Ray Jagessar, who is currently a store manager within Gurreri's district. (*See* Def.'s SMF ¶ 5; Jagessar Dep. 18:3–16). Gurreri states he did not know Jagessar's national origin before this lawsuit was filed. (*See* Declaration of Anthony Gurreri . . . ("Gurreri Declaration") ¶ 3 [ECF No. 41-2]). At her deposition, Jagessar could not recall ever having told Gurreri she was from Guyana. (*See* Jagessar Dep. 28:13–23).

An EXA may be assigned to any Walgreens store within his or her District Manager's district. (*See* Def.'s SMF ¶ 9). Gurreri's district, the Miami South District, has 41 Walgreens stores. (*See* Gurreri Decl. ¶ 3). Jagessar testified EXAs get moved constantly, and estimates she worked in fifteen different Walgreens stores over the course of her time with Walgreens. (*See* Jagessar Dep. 24:7–16). As an EXA, Jagessar was in training "to acquire the management and technical skills and productivity necessary to become a Store Manager." (Gurreri Decl., Exhibit A — EXA Job Description [ECF No. 41-2]).

In September 2009, Jagessar received a written warning from her then-Store Manager Mike White regarding complaints from several employees regarding "unprofessional and inappropriate comments." (Gurreri Decl. ¶ 13; *see also* Gurreri Decl., Exhibit B – September 8, 2009 Email from Mike White [ECF No. 41-2] ("Employees reported that Ms. Jagessar['s] comments resulted in making them uncomfortable and uneasy.")). To give Jagessar a "fresh start," Gurreri transferred her from Store 10264, located in Homestead, Florida, to Store 3105, in Westview, Florida. (Gurreri Decl. ¶ 14). Gurreri also explained Jagessar had informed him she and her husband had moved from Homestead to Miami Lakes, Florida, and the move to Store 3105 was meant to "accommodate[]" her new home. (*Id.*). At her deposition, Jagessar testified during her time at Store 3105, "I think I was living in Miami Springs. I don't remember exactly. I want to say Miami Springs." (Jagessar Dep. 251:4–11). In her Response, Jagessar claims she did not live in Miami Lakes and is "not aware of any female EXAs being transferred 30 miles or more except me." (Resp. 3).

In late 2010, Gurreri's district was realigned, and Store 3105 was moved out of his district. (*See* Gurreri Decl. ¶ 15). Jagessar requested a transfer back into Gurreri's district. (*See id.*). Gurreri claims Jagessar expressed an interest in being promoted to Store Manager, and he accordingly offered her a position as an EXA with one of his "top Store Managers" at a high-volume store. (*Id.* ¶¶ 16, 18). According to Gurreri, Jagessar declined that placement because it was a 24-hour location. (*See id.* ¶ 19). Gurreri accordingly assigned Jagessar to a non-24-hour location, Store 6603, in West Kendall, Florida. (*See id.* ¶ 20).

At Store 6603, Jagessar's Store Manager, Paul Conover, "had many issues" with Jagessar's job performance, which he assigned an overall score of 2.6 on a scale from 1 to 5. (Def.'s SMF ¶¶ 29–30). Conover's review also noted Jagessar's self-assessment claimed she

was actively involved in assisting the pharmacy, but all three pharmacy employees Conover questioned refuted Jagessar's version of events. (*See* Annual Performance Review (FY11) for EXAs at 8 [ECF No. 41-1]; Jagessar Dep. 287:3–288:11). Jagessar's performance review was completed but never given to her, as she requested a personal leave of absence beginning June 8, 2011. (*See* Def.'s SMF ¶ 34). Gurreri approved her initial request for a leave of absence as well as her request for an extended leave in August 2011. (*See id.*). Jagessar eventually returned to work on December 2, 2011. (*See id.* ¶ 35). Upon her return, Gurreri assigned Jagessar to Store 10793, also in West Kendall, Florida. (*See id.* ¶ 36). Jagessar never worked at this location, however, because she requested a store assignment closer to Homestead, Florida, where she lived at the time. (*See id.* ¶ 37; Pl.'s SMF ¶ 36). Gurreri honored Jagessar's request and assigned her to Store 9788 in Homestead. (*See* Def.'s SMF ¶ 37).

In April 2012, Yandry Benitez ("Benitez") became the Store Manager at Store 9788. (*See id.* ¶ 39). Shortly after arriving at Store 9788, Benitez noticed Jagessar and a co-worker, Senior Beauty Advisor Mildred Torres ("Torres"), discounting items for sale below 75 percent of their retail prices, in violation of Walgreens policy, which limits markdowns to 75 percent. (*See id*. ¶ 41). Benitez claims he spoke to both Torres and Jagessar regarding the improper markdowns. (*See id.* ¶ 42). Several employees of Store 9788 recall being told markdowns below 75 percent were not permitted. (*See id.* ¶ 46).

In July 2012, Walgreens received an anonymous email complaint alleging Benitez was showing favoritism toward certain employees with respect to hiring and scheduling decisions. (*See id.* ¶ 47). Jagessar testified she did not file the complaint against Benitez. (*See* Jagessar Dep. 61:7–9) As part of Walgreens's investigation of the complaint against Benitez, Jagessar was interviewed regarding the allegations against him. (*See* Def.'s SMF ¶ 49). Jagessar

corroborated the allegations, including that Benitez had favored certain employees in making scheduling decisions, and that Benitez had hired a relative. (*See id.*). Jagessar alleges Benitez gave Assistant Manager Mariennys Rodriguez "a better schedule as opposed to Plaintiff." (Am. Compl. ¶ 18). At her deposition, Jagessar explained she felt Rodriguez received better scheduling from Benitez because Rodriguez was given Saturday shifts. (*See* Jagessar Dep. 42:16–44:9). Adam Morgan, another employee of Store 9788, also corroborated the complaints against Benitez. (*See* Def.'s SMF ¶ 55). Morgan is still working at Walgreens. (*See id.*). After the investigation, Gurreri issued Benitez a written warning regarding his hiring of a relative and the scheduling allegations. (*See id.* ¶ 54).

Sensing tension between Benitez and Jagessar, Gurreri decided to transfer Jagessar to Store 11880, where Gurreri thought Jagessar would be a good fit with the store manager, Mariela Tuero. (*See id.* ¶¶ 58–59; Gurreri Decl. ¶ 34). Jagessar's husband, a store manager under Gurreri, asked Gurreri to reconsider the assignment, since Jagessar's commute to Store 11880 would be substantial. (*See* Gurreri Decl. ¶ 35). Jagessar alleges the transfer was retaliatory for "speaking out on Mr. Benitez" and claims there was no tension between Benitez and her. (Am. Compl. ¶ 26; *see also* Pl.'s SMF ¶¶ 58, 61). Jagessar insists her transfer to Store 11880, which involved a commute of over 30 miles each way, was "intentional to make life difficult for her," and that no other female EXAs "travel these distances." (Pl.'s SMF ¶ 61). Gurreri, however, notes several Hispanic and non-Hispanic managers in his district, including Jagessar's husband, Ray Jagessar, "have commutes that approach or even exceed 30 miles each way." (Gurreri Decl. ¶ 36). Jagessar's transfer to Store 11880 was announced on July 26, 2012 and effective September 1, 2012. (*See* Def.'s SMF ¶ 57).

On July 28, 2012, Jagessar marked down various retail items below 75 percent off their

original price and set them aside for her to purchase. (*See* Def.'s SMF ¶ 63). Benitez had taken a two-week vacation beginning the day before, on July 25, 2012. (*See id.* ¶ 56). On July 30, 2012, Jagessar purchased the items she had discounted and set aside. (*See id.* ¶ 67). Jagessar does not dispute that she did so (*see generally* Resp.), but asserts Benitez authorized her to mark down prices below 75 percent off, and states the subject merchandise was initially available "for customers and employees to purchase." (Pl.'s SMF ¶¶ 65, 67, 71). Jagessar admits both she and Torres ultimately purchased several items marked down below 75 percent. (*See id.* ¶ 67).

When Benitez returned from his vacation in early August 2012, he reviewed the store's video surveillance tapes and observed Jagessar and her husband, Store Manager Ray Jagessar, carrying out a pallet (twenty cases) of bottled water. (*See* Declaration of Yandry Benitez . . . ¶ 17 [ECF No. 41-3]). Noting the lack of an interstore transfer form or purchase record, Benitez reviewed Jagessar's transactions and realized Jagessar had marked down several items below 75 percent off. (*See id.* ¶¶ 17–18). Benitez reported the markdowns to the Loss Prevention Department ("Loss Prevention"). (*See* Def.'s SMF ¶ 65). Loss Prevention initiated an investigation, and District Loss Prevention Manager Rick Gonzalez ("Gonzalez") confirmed Jagessar had marked down several items below 75 percent off while Benitez was on vacation. (*See id.* ¶ 66; Declaration of Richard Gonzalez . . . ("Gonzalez Declaration") ¶¶ 3, 10 [ECF No. 41-4]). Gonzalez subsequently requested an employee purchase report for the period while Benitez was on vacation, and discovered Jagessar had purchased several of the items she had marked down below 75 percent off on July 30, 2012. (*See* Def.'s SMF ¶ 67; Gonzalez Decl. ¶ 11).

During the investigation of Jagessar and Torres's purchases, Benitez told investigators he had previously chastised Jagessar and Torres regarding improper markdowns, and denied having

authorized Jagessar to mark down prices beyond 75 percent.  (*See* Def.'s SMF ¶¶ 72–73).  Torres corroborated Benitez's statement and explained she assumed Jagessar had the necessary authorization to discount the items since she was an EXA.  (*See id.* ¶¶ 74–75; Declaration of Mildred Torres . . . ¶ 11 [ECF No. 41-6]).  Jagessar insisted Benitez never spoke to her regarding improper markdowns and claimed Benitez instructed her to mark down the items below 75 percent.  (*See* Pl.'s SMF ¶ 73; Case Inquiry Report (Case Number 1241896) at 4 [ECF No. 41-1]).  In her statement to the Walgreens investigators, Jagessar said she set aside a basket of marked down items behind the cosmetics register and purchased them two days later.  (*See* Def.'s SMF ¶ 70; Jagessar Dep. 233:21–234:6; Case Inquiry Report (Case Number 1241896) at 4).

Based on the results of the investigation, Benitez's and Torres's statements refuting Jagessar's version of events, and a discussion with Gonzalez and Jagessar's current store manager, Mariela Tuero, Gurreri decided to terminate Jagessar.  (*See* Def.'s SMF ¶¶ 79–80; Gurreri Decl. ¶ 42).  Because Jagessar was no longer at Benitez's store, Benitez was not involved in the decision to terminate Jagessar.  (*See* Def.'s SMF ¶ 81).  Jagessar nevertheless claims Benitez discriminated against her by intentionally reporting her to Loss Prevention "since [s]he was not Hispanic."  (Pl.'s SMF ¶ 81).  Gurreri terminated Jagessar on September 11, 2012.  (*See* Jagessar Dep. 97:25–98:2).  After she was terminated, Jagessar contacted Gurreri and Walgreens management for her end-of-year bonus.  (*See id.* 137:9–138:19).  Although Jagessar never received a response from Walgreens management, Gurreri eventually reached out to Jagessar and had her pick up the bonus directly from him.  (*See id.*).

On June 6, 2013, Jagessar filed her Amended Complaint, alleging one count of "intentional discrimination" based on national origin in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. section 2000e-2(a). (Am. Compl. 9–10). (*See also* Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination [ECF No. 41-1] ("I believe that I have been discriminated against because of my national origin/Guianese in violation of Title VII of the 1964 Civil Rights Act, as amended.")). Walgreens presently moves for summary judgment. (*See generally* Mot.).

## II.  LEGAL STANDARD

Summary judgment shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a), (c). "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (internal quotations marks omitted). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Burgos v. Chertoff*, 274 F. App'x 839, 841 (11th Cir. 2008) (quoting *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks omitted)). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Channa Imps., Inc. v. Hybur, Ltd.*, No. 07-21516-CIV, 2008 WL 2914977, at *2 (S.D. Fla. Jul. 25, 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The movant's initial burden on a motion for summary judgment "consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."

*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (alterations and internal quotation marks omitted)). "[T]he plain language of Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (quoting *Celotex*, 477 U.S. at 322 (alterations and internal quotation marks omitted)).

### III. ANALYSIS

Walgreens argues summary judgment is appropriate as Jagessar cannot establish a *prima facie* case of discrimination. (*See* Mot. 14–16). Even if Jagessar could meet her *prima facie* burden, Walgreens contends she cannot show Walgreens's reason for terminating her is pretextual. (*See id.* 17–18). In response, Jagessar states she has "establish[ed] direct evidence of discrimination based on national origin" or, in the alternative, has demonstrated a *prima facie* case based on circumstantial evidence. (Resp. 7). Jagessar insists her termination was "for a discriminatory purpose" because "[s]he was subjected to treatment very different from those employees who were similarly situated." (*Id.* 6). Jagessar argues her September 2012 transfer to Store 11880 was discriminatory, and the Loss Prevention investigation that ultimately led to her termination was "intentionally" triggered by Benitez because Jagessar is not Hispanic. (*Id.* 4–5). Jagessar further argues "genuine issues of material fact" exist to preclude summary judgment. (*Id.* 1).

Title VII of the Civil Rights Act of 1964 makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff may prove a race discrimination claim through either direct or circumstantial evidence." *Brown v. Ryder Sys. Inc.*, No. 11-62746-Civ, 2013 WL 221496, at *4 (S.D. Fla. Jan. 18, 2013) (citing *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000)). "Direct evidence is evidence, which if believed, proves the existence of the fact in issue without inference or presumption." *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (alterations, citations, and internal quotation marks omitted).

"Absent such evidence, a plaintiff may prove its case through circumstantial evidence, using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) . . . and subsequent cases." *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002). "Under this framework, the plaintiff initially must establish a prima facie case of discrimination." *Id.* (citation omitted). A plaintiff makes out a *prima facie* case of discrimination by establishing: "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class." *Maynard*, 342 F.3d at 1289 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).

"By establishing a prima facie case, the plaintiff creates a rebuttable presumption that the employer unlawfully discriminated against her." *Joe's Stone Crabs, Inc.*, 296 F.3d at 1272 (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983)). "The burden then shifts to the employer to rebut this presumption by producing evidence that its action was taken for some legitimate, non-discriminatory reason." *Id.* (citing *Tex. Dep't of Cmty. Affairs v.*

*Burdine*, 450 U.S. 248, 254–55 (1981)). "An employer's burden to proffer a legitimate nondiscriminatory reason for an action is 'exceedingly light.'" *Beha v. Fla., Dep't of Highway Safety & Motor Vehicles*, No. 4:11cv587-RH/CAS, 2012 WL 5258527, at *2 (N.D. Fla. Oct. 24, 2012) (quoting *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983)). "At this stage of the inquiry, the defendant need not persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof." *Perryman*, 698 F.2d at 1142 (citation and internal quotation marks omitted).

"Should the employer meet its burden of production, the presumption of discrimination is rebutted, and the inquiry proceeds to a new level of specificity, in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *Joe's Stone Crabs, Inc.*, 296 F.3d at 1272–73 (citation and internal quotation marks omitted). "In order to show pretext, the plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Brown*, 2013 WL 221496, at *4 (citation and internal quotation marks omitted). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030 (footnote call number and citations omitted). "Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." *Joe's Stone Crabs, Inc.*, 296 F.3d at 1273 (citations omitted).

Jagessar asserts she has "establish[ed] direct evidence of discrimination based on national origin." (Resp. 7). Specifically, Jagessar claims her transfer to Store 11880, which involved a

lengthy commute, was "intentional to make life difficult for her and to discriminate against her." (*Id.* 4; Pl.'s SMF ¶ 61). Jagessar also contends "unfavorable treatment" from Benitez regarding her schedule constitutes direct evidence of discrimination, and that Benitez "intentionally had [her] investigated" by Loss Prevention because she is not Hispanic. (Resp. 4–5). Although Plaintiff concedes "any one incident when taken in complete isolation may not lead [the trier of fact to find] discrimination," she argues her "grievances . . . when taken together in totality can only lead to on [sic] logical conclusion . . . [Plaintiff was singled out] because of her race and national origin." (*Id.* 6–7).

"[D]irect evidence of discrimination [is] evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (alterations added; internal quotation marks and citations omitted). In *Mohamed*, the undersigned explained "statements and actions are not direct evidence of discrimination [when] they merely 'suggest[], but do[] not prove' discrimination." *Mohamed v. Pub. Health Trust of Miami-Dade Cnty.*, No. 09-21235-CIV, 2010 WL 2844616, at *7 (S.D. Fla. July 19, 2010) (quoting *Akouri v. Fla. Dep't of Transp.*, 408 F.3d 1338, 1347 (11th Cir. 2005)). "Direct evidence of discrimination is evidence, that, if believed, proves the existence of a fact in issue without interference or presumption." *Id.* (citation and internal quotation marks omitted).

Walgreens has presented evidence demonstrating EXAs were subject to transfer at any time to any store within the EXAs' districts. (*See* Gurreri Decl. ¶ 9). Although Jagessar claims the transfer to Store 11880 was "intentional to make life difficult for her," and that no other female EXAs "travel these distances," Plaintiff has not brought a gender discrimination claim, nor has she demonstrated how the transfer proves discrimination against individuals from

Guyana without inference or presumption. (Pl.'s SMF ¶ 61). *See Brown v. Lassiter-Ware, Inc.*, No. 6:11-cv-1074-Orl-36DAB, 2013 WL 4456546, at *6 (M.D. Fla. Aug. 16, 2013) ("[T]he proffered evidence must clearly indicate that the adverse employment action itself was motivated by discriminatory animus." (citing *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227–28 (11th Cir. 2002); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358–59 (11th Cir. 1999))). "In other words, the evidence must indicate that the complained-of employment decision was *motivated* by the decision-maker's [discriminatory animus]." *Damon*, 196 F.3d at 1358–59 (alteration added; emphasis in original).

Although Jagessar testified she believes Gurreri, Benitez, and Gonzalez all discriminated against her because of her national origin (*see* Jagessar Dep. 25:2–7), she only alleges Benitez harbored a discriminatory animus, accusing Benitez of favoring Hispanics, particularly Cubans (*see* Am. Compl. ¶¶ 16, 18–20, 37). Jagessar alleges Gurreri improperly transferred her to Store 11880 in "retaliation for speaking out on Mr. Benitez, [sic] behavior, who was promoted by Mr. Gurreri." (Am. Compl. ¶ 26). Even if Jagessar's Amended Complaint had asserted a claim for retaliatory discrimination, the transfer to Store 11880 still would not constitute direct evidence of discrimination. First, Adam Morgan, who also corroborated the complaints against Benitez, remained at Benitez's store until he requested and received a transfer in December 2013. (*See* Def.'s SMF ¶ 55; Gurreri Decl. ¶ 46). Second, Walgreens has presented evidence demonstrating several managers, including Jagessar's husband, have lengthy commutes within Gurreri's district. (*See* Gurreri Decl. ¶ 36). Third, Jagessar's employment history makes clear Gurreri transferred her several times (*see* Jagessar Dep. 24:7–16; Gurreri Decl. ¶¶ 11, 14, 20, 25), but Jagessar only takes issue with the transfers that inconvenienced her (*see* Am. Compl. ¶¶ 26, 37; Resp. 3–4).

Jagessar's claims of discrimination are insufficient to establish a *prima facie* case of discrimination. *See Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) ("While [plaintiff] has testified that he felt discriminated against, his opinion, without more, is not enough to establish a prima facie case of race discrimination." (alteration added; citations omitted)). Because Gurreri often transferred managers, including Jagessar, to different stores within his district, a reasonable juror would be required to draw an inference that Gurreri's transfer of Jagessar to Store 11880 was motivated by a discriminatory animus toward individuals from Guyana. Since Jagessar's transfer to Store 11880 does not prove discrimination "without inference or presumption," it cannot be considered direct evidence of discrimination. *Mohamed*, 2010 WL 2844616 at *7.

Jagessar also claims Benitez's report to Loss Prevention is direct evidence of discrimination, asserting Benitez "intentionally had [her] investigated, since [s]he was not Hispanic." (Resp. 5). In support of her claim that Benitez discriminated against her on the basis of national origin, Jagessar states Benitez "showed favoritism" toward Assistant Manager Mariennys Rodriguez, who is "a fellow Hispanic." (*Id.* 4). Apart from alleging Benitez gave Rodriguez "a better schedule as opposed to Plaintiff" (Am. Compl. ¶ 18; *see also* Jagessar Dep. 42:16–44:9), Jagessar provides nothing else to support her contention that Benitez was motivated by a discriminatory animus against people from Guyana in reporting her to Loss Prevention (*see* Am. Compl. ¶¶ 16, 18–20, 37). A reasonable juror would have to draw an inference that Benitez was motivated by a discriminatory animus against individuals from Guyana in reporting Jagessar to Loss Prevention. Accordingly, Jagessar has not presented direct evidence of discrimination.

As Jagessar has not established a *prima facie* case of discrimination based on direct evidence, she must proceed under the *McDonnell Douglas* framework for evaluating

discrimination cases based on circumstantial evidence. Jagessar argues she has satisfied *McDonnell Douglas* and established a *prima facie* case of discrimination under this framework. (*See* Resp. 7). "The burden of establishing a prima facie case of disparate treatment is not onerous. . . . Yet, to establish a prima facie case, a plaintiff must adduce evidence tending to show that the challenged adverse employment action is not readily explainable by meritorious reasons." *Collins v. Miami-Dade Cnty.*, 361 F. Supp. 2d 1362, 1375 (S.D. Fla. 2005) (internal citations omitted). To meet her burden and establish a *prima facie* case, Jagessar must show she was "treated less favorably than a similarly-situated individual outside [her] protected class." *Maynard*, 342 F.3d at 1289 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802) (alteration added)).

"The plaintiff and the employee she identifies as a comparator must be similarly situated in all relevant respects. . . . The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson*, 376 F.3d at 1091 (internal quotation marks and internal citations omitted). "This analysis should include an evaluation of whether 'the plaintiff is matched with a person or persons who have *very similar job-related characteristics* and who are *in a similar situation* to determine if the plaintiff has been treated differently than others who are similar to h[er].'" *Wehunt v. R.W. Page Corp.*, 352 F. Supp. 2d 1342, 1351 (M.D. Ga. 2004) (quoting *MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 774 (11th Cir. 1991) (alteration added; emphasis in original)).

Jagessar asserts she was "treat[ed ] differently than those similarly situated" because Walgreens "investigat[ed] her and then terminat[ed] her for conduct of which [sic] other Hispanic employees in the same position still remain employed." (Resp. 7 (alterations added)). Specifically, Jagessar alleges Mariennys Rodriguez ("Rodriguez") and Photo Tech Vianela

Paulino ("Paulino") — two Hispanic Walgreens employees — also marked down and set aside discounted merchandise for purchase at a later date. (*See* Am. Compl. ¶ 21). Jagessar claims another Hispanic employee, Service Clerk Pablo Cabrera (now Pablo Perez) ("Perez") marked down items below 75 percent. (*See* Resp. 7). At her deposition, however, Jagessar admitted she never saw how much Perez marked down retail items, and that she only overheard Benitez tell Perez to "blow them out." (Jagessar Dep. 198:15–199:4). Jagessar did not allege in her Amended Complaint that other employees discounted items more than 75 percent and purchased them, nor could she say at her deposition how much other employees marked down items. (*See* Am. Compl. ¶ 21; Jagessar Dep. 54:4–56:17; 59:24–60:15; 198:24–199:4). Jagessar nevertheless maintains she has established a *prima facie* case of discrimination because Rodriguez, Paulino, and Perez "marked down items below 75 percent and purchased them later." (Resp. 7).

Beyond the assertions in her Response, Jagessar offers nothing to suggest other employees discounted items below 75 percent off and set them aside for their own purchase. Jagessar never alleges those comparators were accused of or investigated for the same conduct by Walgreens (*see generally* Am. Compl.), and Walgreens has presented evidence demonstrating the other employees were never investigated by Loss Prevention nor captured by Loss Prevention's routine oversight (*see* Gonzalez Decl. ¶¶ 4, 25). Jagessar herself admitted she did not actually see the improper markdowns she claimed occurred. (*See* Jagessar Dep. 54:4–56:17; 59:24–60:15; 198:15–199:4). Jagessar's assertions that other employees similarly discounted and purchased retail items are also refuted by the alleged comparators themselves. (*See* Declaration of Mariennys Rodriguez . . . ("Rodriguez Declaration") ¶ 8 [ECF No. 41-5]; Declaration of Vianela Paulino . . . ("Paulino Declaration") ¶ 8 [ECF No. 41-7]; Declaration of

Pablo Perez . . . ("Perez Declaration") ¶ 11 [ECF No. 41-8]). Because Jagessar has not established that her alleged comparators were in a similar situation and treated differently, she has not established that Rodriguez, Paulino, and Perez are similarly-situated individuals. *See Holifield*, 115 F.3d at 1563 ("[N]o evidence in the record shows that the quality of [the comparator's] work was a concern at FCI Marianna. [The comparator] was not accused of the same or similar conduct as Holifield, and is not similarly situated for purposes of establishing a prima facie case." (alterations added)).

Walgreens further argues Rodriguez, Paulino, and Perez cannot be considered similarly-situated comparators because "[b]y virtue of her position as an EXA, Plaintiff was held to a higher standard of conduct and is therefore not similarly situated to her alleged comparators as a matter of law." (Mot. 15). Walgreens contends Jagessar has not shown similarly situated employees were treated more favorably because even if she could substantiate her allegations regarding misconduct by other employees, those other employees are not EXAs. (*See id.* 15–16).

Walgreens's position is well taken. Jagessar, as an EXA, occupied the "second highest" position in the store. (Gurreri Decl. ¶ 17). Rodriguez, Paulino, and Perez were all Jagessar's subordinates. (*See* Rodriguez Decl. ¶¶ 4, 9; Paulino Decl. ¶ 9; Perez Decl. ¶ 10). Even if Rodriguez, Paulino, and Perez had been investigated and found responsible for similar misconduct, Jagessar is not similarly situated by virtue of her managerial position. *See Etienne v. Muvico Theaters, Inc.*, No. 01-6265-CIV, 2003 WL 21184268, at *13 (S.D. Fla. Mar. 11, 2003) ("Mr. Etienne's duties as senior manager — which included overseeing the activities of the other managers — differed and were separate from those of the other managers. To a significant extent, Mr. Etienne, by virtue of his position, was not similarly situated in certain respects to the other managers." (internal quotation marks omitted)); *Wehunt*, 352 F. Supp. 2d at

1351 n.6 ("Plaintiff originally asserted that Rutledge was also her comparator. Rutledge was an Assistant Metro Editor and worked as Plaintiff's subordinate; he clearly had different job duties and cannot be considered similarly situated to Plaintiff."). Jagessar has not established she and her comparators are similarly situated, and she has therefore failed to demonstrate a *prima facie* case of discrimination.

Even if Jagessar had established a *prima facie* case of discrimination, the burden of production would then shift to Walgreens "to articulate some legitimate, nondiscriminatory reason for the adverse action in order to rebut the inference of discrimination." *Collins*, 361 F. Supp. 2d at 1376 (citations omitted). "[T]his burden is exceedingly light." *Id.* (alteration added; citing *Perryman*, 698 F.2d at 1142). Here, Walgreens has presented legitimate, non-discriminatory reasons for Jagessar's transfer to Store 11880 and her termination. Gurreri stated he transferred Jagessar because he believed she would get along well with Store 11880's Store Manager, Mariela Tuero, and because he needed an EXA at that store. (*See* Gurreri Decl. ¶¶ 34–35). Gurreri also testified several other managers in his district, including Jagessar's husband, have similarly long commutes to their stores. (*See id.* ¶ 36). Jagessar herself admitted "EXAs get moved constantly." (Jagessar Dep. 24:7–9). With respect to her termination, Walgreens submits Jagessar was terminated because an investigation by Loss Prevention revealed she improperly discounted items below what Walgreens policy allows and set those items aside for her own subsequent purchase, which Walgreens considers a form of theft. (*See* Reply 1; Gurreri Decl. ¶¶ 37–42). Because Walgreens has proffered legitimate reasons for the adverse action it took against Jagessar, the inquiry proceeds to the next step, in which Jagessar must show the proffered reason really is pretext for unlawful discrimination. *See Joe's Stone Crabs, Inc.*, 296 F.3d at 1272–73 (citation omitted).

Jagessar offers no argument to suggest Walgreens's proffered reason is pretextual. Jagessar devotes her entire Response to arguing "Plaintiff has met her Title VII Burden of Proof and has Established a Prima Facie Case of Race and/or National Origin Discrimination." (Resp. 6). There is nothing in her Response even attempting to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Brown*, 2013 WL 221496, at *4 (citation and internal quotation marks omitted). Where an employer has proffered a legitimate, non-discriminatory reason for the adverse action taken, "an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030 (footnote call number and citations omitted).

Jagessar has failed to carry her burden. Jagessar claims she was only investigated because Benitez "intentionally" triggered the investigation (Resp. 5), but the decision to terminate her was made by Gurreri without input from Benitez (*see* Gurreri Decl. ¶ 43). Even if Benitez was motivated by a discriminatory animus in reporting Jagessar's actions to Loss Prevention, "[t]he biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." *Holifield*, 115 F.3d 1563–64 (alteration added; internal quotation marks and citations omitted).

Jagessar does not dispute any of Walgreens's factual allegations regarding her misconduct, yet she baldly maintains she was terminated on the basis of her national origin. (*See* Resp. 7). Jagessar does little more than disagree with the reasoning behind her termination. As a result, Jagessar has not met her burden to suggest Walgreens's proffered reason for terminating her is pretextual. *See Jones v. Miami-Dade Cnty.*, No.0320674-CIV-ALTONAGA, 2005 WL

2456869, at *7 (S.D. Fla. 2005) ("'The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons.'" (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998))).  Jagessar has failed to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Walgreens's proffered reason for terminating her that a reasonable factfinder could find them all unworthy of credence. *Brown*, 2013 WL 221496, at *4 (citation and internal quotation marks omitted).  Accordingly, summary judgment on Jagessar's discrimination claim in favor of Walgreens is appropriate.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment . . . **[ECF No. 41]** is **GRANTED**.  An order of final judgment shall be entered separately.  The Clerk of Court is instructed to **CLOSE** the case, and any pending motions are **DENIED as moot**.

**DONE AND ORDERED** in Miami, Florida, this 19th day of March, 2014.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:  counsel of record